## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

### CHARLESTON DIVISION

BRYAN D.,

       Plaintiff,

v.                             CIVIL ACTION NO. 2:24-cv-00667

FRANK BISIGNANO,[1]
Commissioner of Social Security,

       Defendant.

### PROPOSED FINDINGS & RECOMMENDATION

Plaintiff Bryan D. ("Claimant") seeks review of the final decision of Defendant, the Commissioner of Social Security (the "Commissioner"), denying his application for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. §§ 401–33, and for Supplemental Security Income under Title XVI of the Social Security Act, 42 U.S.C. §§ 1381-83f. (ECF No. 2). This matter is assigned to the Honorable Joseph R. Goodwin, United States District Judge, and was referred by standing order to the undersigned United States Magistrate Judge to consider the pleadings and evidence and to submit proposed findings of fact and recommendations for disposition pursuant to 28 U.S.C. § 636(b)(1)(B). (ECF No. 3). Presently pending before this Court are Claimant's *Brief* in support of his claim (ECF No. 9) and the Commissioner's *Brief in Support of Defendant's Decision* (ECF No. 10). Having fully considered the record and the parties'

---

[1] Frank Bisignano became the Commissioner of Social Security on May 7, 2025, at which time he was automatically substituted as a party pursuant to Rule 25(d) of the Federal Rules of Civil Procedure.

arguments, the undersigned respectfully **RECOMMENDS** that the presiding District Judge **GRANT** Claimant's request for remand (ECF No. 9), **DENY** the Commissioner's request to affirm the final decision (ECF No. 10), **REVERSE** the final decision of the Commissioner; and **REMAND** this matter back to the Commissioner for further administrative proceedings pursuant to the fourth sentence of 42 U.S.C. § 405(g).

## I.    BACKGROUND

### A.    Information about Claimant and Procedural History of Claim

Claimant was 55 years old at the time of his alleged disability onset date and 59 years old on the date of the decision by the Administrative Law Judge ("ALJ"). (Tr. 31, 88, 255).[2] He has a high school education, and past relevant work experience as a heavy-equipment operator, construction foreman, and powered-shovel operator. (Tr. 29). Claimant alleges that he became disabled on January 28, 2020, due to the following physical impairments: (1) memory loss; (2) bilateral carpal tunnel; (3) bulging disc; (4) bone spurs; (5) arthritis; and (6) high blood pressure. (Tr. 17, 88).

Claimant filed his applications for Title II and Title XVI benefits (together, the "claim") on December 14, 2020. (Tr. 17). The Social Security Administration (the "Agency") denied the claim initially on September 13, 2021, and again upon reconsideration on June 10, 2022. (Tr. 82-94). Thereafter, on July 20, 2022, Claimant filed a written request for hearing. (Tr. 139-40). An administrative hearing was held before an ALJ on August 8, 2023, and again on February 14, 2024.[3] (Tr. 38-81).

---

[2] All references to "Tr." herein refer to the administrative *Transcript of Proceedings* filed in this action at ECF No. 6.

[3] The ALJ scheduled the February 14, 2024 supplemental hearing because she "need[ed] to ask some additional questions of the vocational expert" due to "some discrepancies in the testimony from the VE [vocational expert]" at the initial hearing on August 8, 2023. (Tr. 41).

Subsequently on March 27, 2024, the ALJ entered an unfavorable decision. (Tr. 14-37). Claimant then sought review of the ALJ's decision by the Appeals Council on April 12, 2024. (Tr. 251-52). Ultimately the Appeals Council denied Claimant's request for review on October 3, 2024, and the ALJ's decision became the final decision of the Commissioner on that date. (Tr. 1-5).

Claimant brought the present action on November 19, 2024, seeking judicial review of the ALJ's decision pursuant to 42 U.S.C. § 405(g). (ECF No. 2). The Commissioner filed a transcript of the administrative proceedings on January 14, 2025. (ECF No. 6). Claimant subsequently filed his *Brief* in support of the action on March 14, 2025. (ECF No. 9). In response, the Commissioner filed his *Brief in Support of Defendant's Decision* on April 14, 2025. (ECF No. 10). Claimant then filed his *Reply Brief* on April 25, 2025. (ECF No. 11). Accordingly, this matter is now ripe for adjudication.

### B.    Relevant Evidence

The undersigned has considered all evidence of record pertaining to the parties' arguments, including the medical evidence, and summarizes the relevant portions here for the convenience of the United States District Judge.

### i.    Treatment Records

On June 3, 2020, Claimant presented to his primary-care provider, Nurse Ellen Newhouse APRN FNP BC, reporting bilateral arm pain and limited arm mobility. (Tr. 482). Claimant reported that the pain was worse in his right arm. *Id.* He reported experiencing pain from his elbows down to his hands, with tingling and burning as well as problems controlling his hands. (Tr. 484). Claimant also reported hypertension. *Id.* Nurse Newhouse ordered testing and prescribed Ibuprofen for the pain. (Tr. 488).

Claimant presented to Cardiologist Melissa Lester, D.O., on September 16, 2020, for management of chest pain and palpitations. (Tr. 413). Treatment notes indicate that Claimant "is confused often, arguing about Camden Park being moved." *Id.* On physical examination, however, Dr. Lester found that Claimant was oriented to person, place, and time, and demonstrated a normal mood and affect. (Tr. 415). Additionally, Dr. Lester found a grade-two systolic murmur in Claimant's cardiovascular system on examination. (Tr. 414). Dr. Lester ordered medical imaging of the brain to address Claimant's confusion and ordered a cardiovascular stress test and event monitor to address Claimant's cardiovascular issue. (Tr. 416). A transthoracic echocardiography reported dated October 7, 2020, indicated normal systolic and diastolic function. (Tr. 433). Additionally, a nuclear myocardial perfusion report dated October 27, 2020 appears to be largely unremarkable. (Tr. 435-36).

Claimant followed up with his primary-care provider, Nurse Newhouse, on September 30, 2020. (Tr. 490). Claimant's wife reported that Claimant's confusion was "continuing and possibly getting worse." (Tr. 491). Claimant also reported continued hand and musculoskeletal pain. *See id.* On examination, Nurse Newhouse observed confusion. (Tr. 493). Her treatment plan consisted of referring Claimant to a hand surgeon, prescribing pain medication, and noting Claimant's appointment with neurology. (Tr. 494).

On November 2, 2020, Claimant presented to Orthopedist Luis E. Bolano, M.D., with complaints of bilateral pain, numbness, and tingling in the hands. (Tr. 552). Claimant reported that the pain was worse in his dominant right hand. *Id.* The pain would wake him up at night, and has progressively worsened since 2010. *Id.* Claimant's mental-status examination was normal. *Id.* On physical examination, Dr. Bolano found that

Claimant's left and right wrists were each positive for carpal tunnel syndrome. (Tr. 552-53). Additionally, Dr. Bolano found that Claimant had lesions of the left and right ulnar nerves. (Tr. 553). Dr. Bolano's treatment plan was to begin with nonsurgical options, including injections, and to follow up in six weeks. (Tr. 554).

In November 2020, medical imaging of Claimant's brain was unremarkable. (Tr. 576).

On February 23, 2021, Claimant presented to Orthopedist Luis E. Bolano, M.D., for a post-operative evaluation after undergoing carpal/cubital tunnel release surgery on the right hand on February 5, 2021. (Tr. 536). Claimant reported that he had no pain, numbness, or tingling, and that he was "over all healing well." *Id.* Claimant had a normal mental status examination as well as a normal examination of his right hand, with normal range of motion in the wrist as well as intact gross sensation and normal strength. (Tr. 536-37).

On February 25, 2021, Claimant presented to Tyler Rosier, Psy.D., for a Neuropsychological Evaluation. (Tr. 576). There is a copy of the initial February 25, 2021 Neuropsychological Evaluation report in the record, but it is illegible. (Tr. 473). It appears that Dr. Rosier found that Claimant's presentation "was significant for reduced effort and as a result testing was considered invalid and uninterpretable." (Tr. 576).

On February 26, 2021, Claimant presented to Neurologist Jorge Lopez, M.D., to evaluate Claimant's report of having memory problems for several months. (Tr. 469). Treatment notes indicate that Claimant's "blood work [was] non revealing[,] MRI of the brain [did] not explain his cognitive issues," and a neuropsychological evaluation report was pending. *Id.* On examination, Claimant was noted to be pleasant and cooperative, with an appropriate fund of knowledge and normal concentration. (Tr. 470). Claimant

was "[a]ble to follow commands and follow conversation without [any] obvious deficit . . . [and] [a]ble to comprehend and articulate with adequate fluency." *Id.* Claimant was "able to name objects, repeat phrases, follow complex commands that cross[ed] mid-line, [and] follow sequential commands." *Id.* Dr. Lopez found that Claimant had "significant difficulty" with short-term memory and minimal difficulty with long-term memory. *Id.* He was noted to be "taking time to think when asked about [his] anniversary" and he "[did not] remember the year." *Id.* His mood and affect were euthymic and congruent. *Id.* Dr. Lopez assessed memory disturbance with possible early onset dementia. The treatment plan included a "referral to [the] dementia clinic depending on the neuropsych evaluation" as well as a "referral to . . . psychiatry for mood disorder evaluation which may be presenting with memory disorder[.]" (Tr. 471).

On July 16, 2021, Claimant presented to Neurologist Samrina Hanif, M.D., for evaluation of reported memory impairment. (Tr. 427). Treatment notes indicate that Claimant "is still [complaining of] short term memory issues and gets upset over [it] if someone reminds him about anything." *Id.* Additionally, treatment notes stated "Memory impairment started in 2019, getting worse, he forgets the discussion and ask[s] the same thing again and again." *Id.* Claimant's wife denied any long-term memory impairment, and it was noted that Claimant was independent with his activities of daily living. *Id.* He reported that he is "under stress when he needs to go to unfamiliar places and wife stays on phone to give him directions[.]" *Id.* Treatment notes indicate that magnetic resonance imaging ("MRI") of Claimant's brain was unremarkable. (Tr. 428). Additionally, treatment notes indicate that neurodegenerative process could not be ruled out because Claimant was "not putting full effort" into neuropsychological testing. *Id.* On examination, Claimant exhibited "significant difficulty with short term" memory, and

"minimal difficulty with long term memory." *Id.* Dr. Hanif noted that Claimant could have early onset dementia, pseudodementia, and/or obstructive sleep apnea. (Tr. 429). Dr. Hanif ordered laboratory work as well as a medical device to address Claimant's possible sleep apnea. *Id.*

Claimant followed up with his primary-care provider, Nurse Newhouse, on July 27, 2021. (Tr. 500). Claimant reported that his carpal/cubital tunnel syndrome was "a lot better" than before. *Id.* After his carpal tunnel release surgery, Claimant indicated he no longer had numbness and pain in his hands, and he no longer used wrist splints; he was doing well overall. (Tr. 552, 527 ("He says it's 100% better.")); *see also* Tr. 345, 357 (reporting no brace/splint)). With respect to his mental functioning, Claimant reported to Nurse Newhouse that his insurance denied his claim for a sleep-apnea machine because "testing was not bad enough[.]" *Id.* Claimant's wife also reported that Claimant's "memory issues [were] increasing mildly." *Id.* Nurse Newhouse's treatment plan was to continue medications as previously prescribed and follow up in two months. (Tr. 504). Nurse Newhouse also noted that she "[e]ducated" Claimant "on [the] importance of medication adherence and self accountability regarding appointments, not only with [Nurse Newhouse] but [also] with specialists and having labs drawn." *Id.*

Claimant followed up with Neurologist Dr. Hanif on August 20, 2021 for continued evaluation of his memory impairment. (Tr. 452). Claimant was "still [complaining of] short term memory issues[.]" *Id.* Treatment notes indicate that a sleep study revealed moderate non-positional obstructive sleep apnea. (Tr. 453). Claimant's mental-status examination was largely identical to the previous visit. *Id.* Dr. Hanif assessed early onset Alzheimer's dementia. (Tr. 454). Dr. Hanif prescribed medication and ordered additional testing as well as a referral for cognitive therapy. *Id.*

On November 10, 2021, Claimant presented to Orthopedist Luis E. Bolano, M.D., for a post-operative evaluation after undergoing carpal/cubital tunnel release surgery on the left hand on March 9, 2021. (Tr. 522, 524). Claimant reported that he was "[o]verall doing well." *Id.* He reported that he occasionally felt a "rolling" sensation in the left elbow, but no longer had numbness or pain and no longer needed to use a wrist splint. *Id.* Dr. Bolano found that Claimant "[h]as improved significantly." (Tr. 523). Dr. Bolano released Claimant to his primary-care provider. *Id.*

On November 12, 2021, Claimant followed up with Neurologist Jorge Lopez, M.D. (Tr. 583). Claimant and his wife both reported that "overall he is stable." *Id.* Claimant reported that he "still" engaged in hunting as a hobby, and that he was able to perform all of his activities of daily living on his own. *Id.* On examination, Claimant was oriented to person, place, and time, and was able to follow commands. (Tr. 584). Dr. Lopez found that "[i]t is not clear that this patient has any cognitive deficits." *Id.* In support of this finding, Dr. Lopez noted that Claimant's neuropsychological evaluation "showed poor effort, and therefore it was not a valid evaluation." *Id.*

On April 7, 2022, Claimant presented to Marshall Neurology in Huntington, West Virginia, for follow-up regarding possible dementia. (Tr. 580). Treatment records show that "[i]t is not clear that this patient has any cognitive deficits." *Id.* Claimant was accompanied by his son, and they requested "having [Claimant's] neuro-psych testing completed again to better evaluate" Claimant's condition following his separation from his wife. *Id.* Claimant reported that he was "able to execute tasks with no issues, manage medications," and perform his activities of daily living independently. (Tr. 581). However, it was noted that Claimant "had some inconsistencies with history" during his examination. *Id.* On examination, he was found to be pleasant, cooperative, in no acute

distress, and oriented to person, place, and time. *Id.* Claimant was assessed with "memory disturbance," as "no one diagnosis fits well." (Tr. 582). Claimant was referred for a reconsult with neuropsychology. *Id.*

Claimant presented to Neuropsychologist Michelle Hudson, Psy.D., on May 2, 2022, for a neuropsychological re-evaluation for "memory disturbance" on referral from Claimant's neurology provider. (Tr. 575). Claimant was accompanied by his daughter. *Id.* Dr. Hudson noted that medical imaging from September 2021 did not "demonstrate a typical distribution for Alzheimer's disease." (Tr. 576). Additionally, genetic testing from November 2021 "was not considered consistent with markers for [Alzheimer's disease]." (Tr. 577). However, Dr. Hudson found that Claimant "was a very limited historian," with significant difficulty providing direct responses" and "difficulty recalling historical dates of events." (Tr. 576). Claimant reported a history of emotional abuse by his wife, and he believed she was "pushing for" a diagnosis of dementia in order to obtain power of attorney. (Tr. 577). Claimant reported that his cognitive functioning had improved "since leaving his wife in March 2022." (Tr. 577). Claimant's daughter reported that her father was able to participate more in conversations and to resume driving a vehicle without any major issues, although he continued to display distractibility and tangential thought process. *Id.* Claimant reported that he was independent in his activities of daily living. *Id.*

Dr. Hudson found that Claimant was only partially oriented, as he reported he did not know the month, date, or location of the facility where the testing occurred. (Tr. 578). Claimant's thought content was "often tangential and perseverative," requiring significant redirection to answer questions. *Id.* Claimant "required frequent repetition of instructions and struggled to maintain task set." *Id.* However, there was "no evidence of significant word finding difficulties and no paraphasic errors were noted[.]" *Id.* Dr.

Hudson found that Claimant presented with an anxious affect. *Id.* With respect to performance validity, Dr. Hudson found that Claimant's responses were "similar to normative samples of patients with feigned cognitive impairment and to experimental subjects attempting to simulate memory disorders." *Id.* Additionally, "he displayed a pattern of performing much worse than would be expected when compared to his reported functional abilities" such as driving and managing his medications. *Id.* As a result, Dr. Hudson found that Claimant's "performance was considered invalid and uninterpretable" due to "reduced effort on multiple measures." *Id.* Dr. Hudson concluded that she was "unable to speak to [Claimant's] current level of cognitive functioning." (Tr. 579). She recommended "referral to behavioral health to address reported symptoms of depression, anxiety, and possible somatoform disorder." *Id.*

Claimant followed up with his primary-care provider, Nurse Newhouse, on June 15, 2022. (Tr. 595). Claimant presented with his wife, and his wife stated that she wanted Claimant to be restarted on his Aricept prescription. *Id.* Nurse Newhouse's treatment plan was to call Claimant's neurologist and confirm whether Aricept was recommended. (Tr. 598). Subsequently on September 15, 2022, Claimant presented to Nurse Newhouse for follow-up. (Tr. 600). Claimant reported that he was "staying active and spending time with [his] granddaughter." *Id.* Nurse Newhouse noted that Claimant and his wife had conflicting narratives; Claimant reported that his memory was "a whole lot better than it used to be," while Claimant's wife reported that "he continues to misplace things and says that someone stole it." *Id.* Nurse Newhouse further noted that Claimant's responses were "very vague" and that Claimant was "unable to give direct answers to questions." *Id.* Additionally, Claimant's "[t]rain of thought [was] not good, [and] veers off track." *Id.* Nurse Newhouse noted that Claimant's wife "[r]equest[ed] another referral to a different

neurologist, someone she can understand and can give a pin pointed diagnosis of patient's problems so that he can be granted his disability." (Tr. 601). Nurse Newhouse's treatment plan called for referral to neurology and to a counselor/therapist. (Tr. 604).

On November 8, 2022, Claimant presented to the Tug Valley Wellness Clinic in Williamson, West Virginia, where he was seen by Nurse Tonya Chafin, APRN. (Tr. 630). Treatment records indicate that Claimant "gave verbal consent to speak with [his] Daughter" but instructed "[d]o NOT release any information to [Claimant's] ex-wife. (Tr. 631). Claimant was diagnosed with, *inter alia*, unspecified anxiety disorder and depression. (Tr. 633). It appears Claimant presented for follow-up to obtain medication refills and did not have any present complaints. (Tr. 630-35). Nurse Chafin refilled Claimant's prescription medications and noted that she would "fill out paperwork for [Claimant] to have his driver license back because again at this visit he had no issues." (Tr. 636). Claimant's daughter had reported previously on October 26, 2022, that Claimant was "not having issues with his memory, [and] that he just took multiple of his friends through the hills and showed them every place that he has deer feeders at . . . . He also babysits his daughter's children." (Tr. 641). Nurse Chafin noted that, "[a]fter talking with the patient, I see no evidence of issues with his memory[.]" (Tr. 642).

## ii.    Claimant's Hearing Testimony

At the August 8, 2023 hearing before the ALJ, Claimant was represented by counsel and testified under oath. (Tr. 55-74). Claimant testified that he has past work experience as a heavy-equipment operator. (Tr. 61). During this time, he has worked as a foreman and as a supervisor on various jobs. (Tr. 62). He has worked with a wide range of heavy equipment. (Tr. 64).

With respect to his physical health, Claimant reported difficulty moving his neck, as well as unspecified problems with his hip, knees, and back. (Tr. 65). Claimant testified that he receives medical treatment for this conditions, but he was largely unable to identify his treating physicians or otherwise elaborate on his treatment. (Tr. 65-66). He did testify that he is taking medication called Meloxicam for pain. (Tr. 66). Claimant also testified that he had carpal-tunnel surgery on both hands. *Id*. The "doctor" reportedly instructed Claimant "to be easy on" his left hand, but that his right hand does not have any problems. (Tr. 66-67). With respect to his left hand, Claimant testified that he cannot bend all of his fingers very well, and that he has trouble with dropping items he tries to grasp with the left hand. (Tr. 67). He testified that he has less strength in his left hand than his right. *Id*.

With respect to his daily activities, Claimant testified that he can "cook a little bit" at times despite his physical limitations. (Tr. 68). Claimant testified that he is divorced from his wife, and that he no longer helps babysit his grandchildren. (Tr. 71). He now lives with his elderly mother. *Id*. He is unable to go for a run around the block, but he is able to walk around the yard at times and he also helps his mother. (Tr. 73).

With respect to his mental health, Claimant confirmed that he had a diagnosis of early Alzheimer's disease. *Id*. He recalls that his wife took him to the doctor and reported that he was having issues with memory loss. *Id*. The ALJ questioned whether Claimant disagreed with his wife's reported issues, but the Claimant's testimony in response was unclear and difficult to follow. (*See* Tr. 64-65). Claimant denied needing help to remember to take his medications. (Tr. 72). He denied receiving treatment for memory loss. (Tr. 73). He is able to drive; however, there was a period of time that he did not have his driver's license due to a diagnosis of dementia. (Tr. 69). Claimant testified that "[t]he

dementia . . . wasn't there" but that he still has problems with his memory. *Id.* The ALJ questioned Claimant about his understanding of the dementia issue, but once again the Claimant's testimony in response was unclear and difficult to follow. (*See* Tr. 68-71, 73).

At the February 14, 2024 hearing before the ALJ, Claimant appeared and was represented by counsel, but he did not offer any further testimony. (Tr. 38). However, the ALJ noted that "at the first hearing [Claimant] kind of denied that he had the memory problems." (Tr. 46). The ALJ asked Claimant's counsel whether she wished to address this issue. *Id.* In response, Claimant's counsel stated that "there has been some . . . unwillingness to perhaps accept some of the diagnosis that's been given . . . on that subject." *Id.*

### iii.    Vocational Expert Testimony

At the August 8, 2023 administrative hearing, the ALJ employed Barry S. Hensley, a vocational expert ("VE"), to aid in determining whether Claimant could perform his past relevant work, or other work. (Tr. 75). The ALJ asked VE Hensley to classify Claimant's past relevant work. VE Hensley testified that Claimant has past relevant work as a heavy equipment operator, which is listed in the Dictionary of Occupational Titles ("DOT") at number ("#") 859.683-010, with a specific vocational preparation ("SVP") of six on a scale of one to nine, a medium level of exertion as typically performed, and a heavy level of exertion as actually performed by the Claimant. (Tr. 76). Additionally, Claimant has past relevant work as a construction supervisor or construction "foreman," DOT # 182.167-026, an SVP of seven, a light level of exertion as typically performed, and a medium level of exertion as actually performed by the Claimant. (Tr. 44, 76).

The ALJ next asked VE Hensley to assume that a hypothetical individual had the same age, education, and work history as the Claimant and was capable of performing

work at the medium exertional level, with some additional limitations. (Tr. 76-77). Specifically, the hypothetical individual could occasionally climb ladders, ropes and scaffolds; occasionally kneel, crouch, and crawl; frequently "handle, finger, and feel with the right upper extremity"; occasionally "handle, finger and feel with the left upper extremity"; perform "simple work"; deal with occasional changes in the work environment; and "perform work that is not subject to production demands or quotas." *Id*. In response to the ALJ's hypothetical, VE Hensley testified that such an individual could not perform Claimant's past relevant work—either as actually or as typically performed—based upon the limitations hypothesized by the ALJ. (Tr. 77). Further, VE Hensley testified that "there would be no transferrable skills" to other work. *Id*.

In light of VE Hensley's testimony, the ALJ next asked whether jobs exist in the national economy for an individual with Claimant's age, education, work experience, and RFC. In response, VE Hensley testified that, given all of these factors, such an individual would be able to perform the requirements of other jobs at the "medium" level of exertion under the applicable regulations. (Tr. 77). VE Hensley then provided specific examples of unskilled medium work, testifying that such a classification includes work as (1) an automobile detailer, which is set forth in the Dictionary of Occupational Titles ("DOT") as number ("#") 915.687-010, with 49,000 jobs in the national economy; and (2) a production helper, DOT # 809.687-014, with 41,000 jobs. (Tr. 77-78).

The ALJ then turned to the issue of absenteeism and questioned how many absences an employer would normally tolerate per month. (Tr. 78). VE Hensley testified that an employer would normally tolerate no greater than one absence per month. *Id*. Additionally, VE Hensley testified that an employer would tolerate an employee being off task for no greater than fifteen percent of the workday on a routine and regular basis. *Id*.

Claimant's representative was then permitted to question the VE. She asked VE Hensley whether any jobs would be available if the hypothetical individual could not kneel, crawl, or crouch. (Tr. 78). In response, the VE testified there would be no jobs at the medium level of exertion available under those conditions. *Id.* Additionally, Claimant's representative asked VE Hensley whether any jobs would be available if the hypothetical individual needed "frequent assistance" by a supervisor in order to perform job tasks. (Tr. 78-79). In response, VE Hensley testified that there would be no jobs available under those conditions. (Tr. 79).

Six months later on February 14, 2024, the ALJ held a second hearing where another VE—Donna Nealon—appeared and provided testimony to aid the ALJ. (Tr. 44). The ALJ explained that she found supplemental testimony from a different VE was necessary due to "some discrepancies in the testimony from the VE" during "the prior hearing" on August 8, 2023, and that as a result she "had some additional questions [she] needed to ask."[4] (Tr. 41, 51-52). Addressing VE Nealon, the ALJ asked whether she had "any reason to dispute or disagree with the past relevant work classification[.]" *Id.* In response, VE Nealon testified that she disagreed with VE Hensley's testimony concerning the appropriate code under the Dictionary of Occupational Titles ("DOT") for Claimant's past work as a heavy-equipment operator. *Id.* Specifically, VE Nealon testified that she "would have just listed the bulldozer excavator as two different DOTs." (Tr. 45). VE Nealon stated that, first, she would classify the "bulldozer operator" position as an "operating engineer," with "a different supervisory DOT code, 939.137-018, section supervisor, SVP 7, skilled, medium exertion." (Tr. 44). Second, VE Nealon testified that

---

[4] The ALJ did not specify these "discrepancies" on the record. *See id.*

she would also classify this type of work as a "power shovel operator," DOT # "850.683-030, SVP 5, skilled, medium exertion[.]" (Tr. 44-45). VE Nealon testified that this would have been a "composite job." (Tr. 46).

The ALJ next asked VE Nealon to assume that a hypothetical individual had the same age, education, and work history as the Claimant and was capable of performing work at the medium exertional level, with some additional limitations. (Tr. 47-48). Specifically, the hypothetical individual could occasionally kneel; occasionally climb ladders, ropes, and scaffolds; occasionally crawl and crouch; frequently "handle, finger, and feel" with the right upper extremity; occasionally "handle, finger, and feel" with the left upper extremity; perform simple work; deal with occasional changes in the work environment; and perform work that is not subject to production demands or quotas. (Tr. 48). In response to the ALJ's hypothetical, VE Nealon testified that such an individual could not perform Claimant's past relevant work and there would be no transferrable skills to other work. *Id.*

In light of VE Nealon's testimony, the ALJ next asked whether there would be "any other work in the national economy that the individual could perform at that exertional level[.]" *Id.* In response, VE Nealon asked to clarify whether Claimant's right or left hand was his dominant hand. *Id.* After questioning Claimant, the ALJ found that Claimant was right-handed. *Id.* VE Nealon testified that, given all of these factors, such an individual would be able to perform the requirements of other jobs at the "medium" level of exertion under the applicable regulations. (Tr. 77). VE Nealon then provided specific examples of unskilled medium work, with an SVP of two, testifying that such a classification includes work as (1) a laundry laborer, which is set forth in the Dictionary of Occupational Titles ("DOT") as number ("#") 361.687-018, with 118,000 jobs in the national economy; (2) a

hospital cleaner, DOT # 323.687-010, with 391,000 jobs; and (3) a counter supply worker, DOT # 319.687-010, with 91,000 jobs. (Tr. 48-49).

Next, the ALJ turned to the issue of an employer's tolerance for absenteeism and off-task time. (Tr. 49). VE Nealon testified that an employer's tolerance for "time off task" "can be ten to fifteen percent" typically, and "on a very rare occasion, twenty percent off task." *Id.* With respect to absenteeism, VE Nealon testified that "one to two absences per month as a combination of planned and unplanned [absenteeism] is acceptable" while "[t]hree or more [absences] is not." *Id.*

Claimant's representative was then permitted to question the VE. (Tr. 50). She asked VE Nealon, in relevant part, whether any jobs would be available if Claimant could handle, finger, and feel bilaterally on only an occasional basis. *Id.* In response, the VE testified there would be no jobs available under those conditions. *Id.*

Finally, VE Nealon testified that her testimony was "consistent with the DOT and the SCO."[5] *Id.* VE Nealon explained that "[t]here are some issues that are not addressed [in the referenced publications] such as off task, absences, reaching, handling, and fingering, right versus left, needing frequent reminders and additional breaks[.]" *Id.* VE Nealon testified that "in those circumstances [her] testimony is based on [her] experience working with employers in the field." (Tr. 50-51).

### iv.    Consultative Evaluations

Nurse Katherine Endicott, APRN, performed a consultative examination of Claimant on April 11, 2022. (Tr. 568). Claimant reported, *inter alia*, a history of bilateral wrist pain secondary to carpal tunnel syndrome and a history of bilateral carpal tunnel

---

[5] It appears the VE referred to the Selected Characteristics of Occupations ("SCO"), a publication by the United States Department of Labor.

release surgeries. (Tr. 569). He reported that his surgeries "helped" and that he now "rarely drops objects." *Id.* However, Claimant reported that he "was told to not jerk and pull on the left arm." *Id.* He reported being "very careful when handling objects, as he has difficulty with picking it up off the floor if he drops it." *Id.* Claimant confirmed that he was diagnosed with Alzheimer's disease; however, he reported that the diagnosis was "a mistake that occurred based on his wife's insistence for his doctor to assign this diagnosis to him." *Id.* Claimant also stated that he believed his memory issues "were mental-health related" due to the social isolation he experienced for a period of three years at the hands of his wife. *Id.* Claimant reported that he was beginning to remember more as he progressively recovered from the social isolation. *Id.* He reported that he was separated from his wife and was living with family. *Id.* He reported being able to complete activities of daily living independently, although he did not drive because his wife "had [his] license pulled." *Id.*

Nurse Endicott noted that Claimant was cooperative, alert, and oriented. (Tr. 570). However, she also had difficulty obtaining Claimant's history "as his thoughts were very scattered." *Id.* Nurse Endicott noted that Claimant would answer questions appropriately "sometimes," but that "at other times his response did not make sense for the question that was asked," and he "had difficulty with following commands at times." *Id.* Nurse Endicott found that Claimant "could not appropriately answer some questions." (Tr. 572).

On examination, Claimant was able to make a tight fist with each hand, and pinch and grip strength were noted to be "5+/5 bilaterally." (Tr. 571). Additionally, Claimant "could perform fine manipulation and gross dexterous movements with each hand." *Id.* Claimant was unable to touch his thumbs to his fifth fingers bilaterally, but otherwise he could oppose his thumb to each finger bilaterally and had "fair manual dexterity." *Id.*

Nurse Endicott also found that Claimant's sensation was "intact to fine touch." *Id.* Based upon these observations, Nurse Endicott concluded that Claimant "may have difficulty with performing repetitive dexterous movements bilaterally" and "may have difficulty with following complex instructions." (Tr. 572).

Next, Psychologist Kelly Robinson, M.A., performed a psychological evaluation of the Claimant on May 18, 2022. (Tr. 587-92). Ms. Robinson noted that Claimant's "son drove him to the interview." (Tr. 587). Claimant denied any problems with cognitive impairment, including memory loss. (Tr. 587). With respect to his background, Claimant reported that he graduated from high school, where he was placed in regular education classes and received good grades. (Tr. 588).

With respect to daily activities, Claimant reported that he talks with family, performs yardwork, takes his medications, prepares meals, cares for pets, and performs housework regularly. (Tr. 591). He also reported that he goes to the grocery store with a family member on a monthly basis. *Id.* He used to bow-hunt as a hobby but is no longer able to do so. *Id.* As to social functioning, Ms. Robinson found that Claimant "presented with a euthymic mood." (Tr. 591). He "was cooperative and friendly during the interview." *Id.* His "[g]rooming and personal hygiene were fair" but "[h]e maintained good eye contact" and had "good" speech production. *Id.* Claimant reported "regular contact with his friends and his children" but he also reported that he was separated from his wife. (Tr. 591-92).

Ms. Robinson performed a mental-status examination and found that Claimant was oriented to person, time, and date. (Tr. 589). Claimant's insight was fair. *Id.* His immediate and remote memory were within normal limits, but his recent memory was impaired. *Id.* His full-scale intelligence quotient ("IQ") was noted to be between 69-76.

(Tr. 590). Ms. Robinson found "a rule out diagnosis of unspecified mild neurocognitive disorder" was appropriate, explaining that "[a]lthough [Claimant] denies any cognitive impairment and reports he 'passed' recent neurocognitive testing, results from [Ms. Robinson's testing] revealed deficits" in multiple areas. (Tr. 591). Ms. Robinson opined that Claimant demonstrated impaired concentration, persistence, and pace, and further that he "appears incapable to manage any benefits he might receive." (Tr. 592).

### C.    Sequential Evaluation Process

An individual unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months" is considered to be disabled and thus eligible for benefits. 42 U.S.C. § 423(d)(1)(A). The Social Security Administration has established a five-step sequential evaluation process to aid in this determination. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4); *Lewis v. Berryhill*, 858 F.3d 858, 861 (4th Cir. 2017). The ALJ proceeds through each step until making a finding of either "disabled" or "not disabled"; if no finding is made, the analysis advances to the next step. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). "The ultimate burden to prove disability lies on the claimant." *Preston v. Heckler*, 769 F.2d 988, 990 n.* (4th Cir. 1985); *see Bird v. Comm'r*, 699 F.3d 337, 340 (4th Cir. 2012) ("To establish eligibility for . . . benefits, a claimant must show that he became disabled before his [date last insured].").

At the first step in the sequential evaluation process, the ALJ determines whether the claimant is engaged in "substantial gainful activity." 20 C.F.R. §§ 404.1520(a)(4)(i), 416.920(a)(4)(i). If the claimant is not engaged in substantial gainful activity, the ALJ moves on to the second step.

At the second step, the ALJ considers the combined severity of the claimant's medically determinable physical and mental impairments. *Id.* §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii). The ALJ gleans this information from the available medical evidence. *See Mastro v. Apfel*, 270 F.3d 171, 177 (4th Cir. 2001). An individual impairment or combination of impairments that is not classified as "severe" and does not satisfy the durational requirements will result in a finding of "not disabled." 20 C.F.R. §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii); *Mascio v. Colvin*, 780 F.3d 632, 634–35 (4th Cir. 2015).

Similarly, at the third step, the ALJ determines whether the claimant's impairment or combination of impairments meets or is medically equal to the criteria of an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. *See* 20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii). "A claimant is entitled to a conclusive presumption that he is impaired if he can show that his condition 'meets or equals the listed impairments.'" *Radford v. Colvin*, 734 F.3d 288, 291 (4th Cir. 2013) (quoting *Bowen v. City of New York*, 476 U.S. 467, 471 (1986)).

"If the first three steps do not lead to a conclusive determination, the ALJ then assesses the claimant's residual functional capacity" ("RFC") before proceeding to the fourth step. *Mascio*, 780 F.3d at 635; *see* 20 C.F.R. §§ 404.1520(e), 416.920(e). The claimant's RFC reflects his "ability to perform work despite [his] limitations." *Patterson v. Comm'r*, 846 F.3d 656, 659 (4th Cir. 2017); *Monroe v. Colvin*, 826 F.3d 176, 179 (4th Cir. 2016) (defining claimant's RFC as "the most the claimant can still do despite physical and mental limitations that affect his ability to work" (alterations and internal quotation marks omitted)); *see* 20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1). The ALJ "first identif[ies] the individual's functional limitations or restrictions and assess[es] his or her

work-related abilities on a function-by-function basis," then "define[s] the claimant's RFC in terms of the exertional levels of work." *Lewis*, 858 F.3d at 862. "In determining a claimant's RFC, the ALJ must consider all of the claimant's medically determinable impairments . . . including those not labeled severe" as well as "all the claimant's symptoms, including pain, and the extent to which his symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence." *Monroe*, 826 F.3d at 179 (alterations and internal quotation marks omitted); *see* 20 C.F.R. §§ 404.1545(a), 416.945(a).

When the claimant alleges a mental impairment, the first three steps of the sequential evaluation process and the RFC assessment are conducted using a "special technique" to "evaluate the severity of [the] mental impairment[]." 20 C.F.R. §§ 404.1520a(a), 416.920a(a); *see Patterson*, 846 F.3d at 659. Considering the claimant's "pertinent symptoms, signs, and laboratory findings," the ALJ determines whether the claimant has "a medically determinable mental impairment(s)" and "rate[s] the degree of functional limitation resulting from the impairment(s)" according to certain criteria. 20 C.F.R. §§ 404.1520a(b), 416.920a(b); *see id.* §§ 404.1520a(c), 416.920a(c). "Next, the ALJ must determine if the mental impairment is severe, and if so, whether it qualifies as a listed impairment." *Patterson*, 846 F.3d at 659; *see* 20 C.F.R. §§ 404.1520a(d), 416.920a(d). "If the mental impairment is severe but is not a listed impairment, the ALJ must assess the claimant's RFC in light of how the impairment constrains the claimant's work abilities." *Patterson*, 846 F.3d at 659.

After assessing the claimant's RFC, the ALJ at the fourth step determines whether the claimant has the RFC to perform the requirements of his past relevant work. 20 C.F.R. §§ 404.1520(a)(4)(iv), 416.920(a)(4)(iv); *Monroe*, 826 F.3d at 180. If the ALJ finds that

the Claimant does not have the RFC to perform the requirements of his past relevant work, then "the ALJ proceeds to step five." *Lewis*, 858 F.3d at 862.

The fifth and final step requires the ALJ to consider the claimant's RFC, age, education, and work experience in order to determine whether he can make an adjustment to other work. 20 C.F.R. §§ 404.1520(a)(4)(v), 416.920(a)(4)(v). At this point, "the burden shifts to the Commissioner to prove, by a preponderance of the evidence, that the claimant can perform other work that 'exists in significant numbers in the national economy.'" *Lewis*, 858 F.3d at 862 (quoting *Mascio*, 780 F.3d at 635). "The Commissioner typically offers this evidence through the testimony of a vocational expert responding to a hypothetical that incorporates the claimant's limitations." *Id.* (quoting *Mascio*, 780 F.3d at 635). If the claimant can perform other work, the ALJ will find him "not disabled." 20 C.F.R. §§ 404.1520(a)(4)(v), 416.920(a)(4)(v). If he cannot perform other work, the ALJ will find him "disabled." *Id.*

Applying the sequential evaluation process in this case, the ALJ determined that Claimant had not engaged in substantial gainful activity since January 28, 2020 the alleged onset of his disability. (Tr. 20). Next, the ALJ found that the following of Claimant's asserted impairments constituted "severe" impairments: (1) arthropathies; (2) lumbago; (3) cervical-disc degeneration; (4) neurocognitive disorder (with an altered memory); and (5) bilateral carpal-and-cubital-tunnel syndrome. *Id.* Next, the ALJ found that Claimant "does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments" in the Social Security Administration's applicable regulations, at 20 C.F.R. Part 404, Subpart P, Appendix 1. *Id.*

Upon assessing Claimant's RFC, the ALJ determined that Claimant has the ability to perform "medium" work as defined in 20 C.F.R. 404.1567(c) and 416.967(c), with the following additional limitations:

> [Claimant] can occasionally kneel, climb ladders, ropes, and scaffolds, crawl, and crouch. He can frequently handle, finger, and feel with the right upper extremity and occasionally handle, finger, and feel with the left upper extremity. He can perform simple work. He can deal with occasional changes in the work environment, and can perform work that is not subject to production demands or quotas.

(Tr. 24).

The ALJ concluded that—given the limitations imposed by the Claimant's RFC—he was unable to perform any of his past relevant work. (Tr. 29.) The ALJ next found that Claimant was "an individual closely approaching advanced age" and that "[t]ransferability of job skills [was] not material to the determination of disability." *Id.* Because the ALJ determined that Claimant was unable to perform the full range of medium work, she enlisted a VE to aid in finding that—considering Claimant's age, education, work experience, and RFC—there are jobs that exist in significant numbers in the national economy that the Claimant can perform. *Id.* In support, the ALJ pointed to the VE's testimony that an individual under Claimant's circumstances would be able to perform the requirements of occupations at a medium, unskilled level such as laundry laborer, hospital cleaner, and counter-supply worker. (Tr. 30.) As a result, the ALJ concluded that Claimant was not disabled, and the claim for benefits was denied.

## II.    LEGAL STANDARD

This Court has a narrow role in reviewing the Commissioner's final decision to deny benefits: it "must uphold the factual findings of the [ALJ] if they are supported by substantial evidence and were reached through application of the correct legal standard."

*Hancock v. Astrue*, 667 F.3d 470, 472 (4th Cir. 2012) (quoting *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005) (per curiam)). "Substantial evidence" is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion," and it must be "more than a mere scintilla." *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019). In other words, this Court "looks to [the] administrative record and asks whether it contains 'sufficient evidence' to support the agency's factual determinations." *Id.* (alteration omitted). "[T]he threshold for such evidentiary sufficiency is not high." *Id.* "In reviewing for substantial evidence, [this Court] do[es] not undertake to reweigh conflicting evidence, make credibility determinations, or substitute [its] judgment for that of the [ALJ]." *Johnson*, 434 F.3d at 653 (quoting *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996)). Even if "reasonable minds [could] differ as to whether a claimant is disabled," this Court upholds the ALJ's decision if it is supported by substantial evidence. *Id.* (quoting *Craig*, 76 F.3d at 589).

## III.    DISCUSSION

Claimant sets forth two assertions of error in this § 405(g) action. First, Claimant argues that the ALJ failed to identify and resolve conflicts between the vocational expert's testimony and the Dictionary of Occupational Titles. (ECF No. 9 at 1; ECF No. 11 at 1). Second, Claimant argues that the ALJ failed to account for the "total limiting effects" of Claimant's mental impairments.

### A.    Claimant's First Assertion of Error

Claimant first argues that the ALJ committed reversible error because she failed to adequately identify and resolve conflicts between the vocational expert's testimony and the Dictionary of Occupational Titles ("DOT"). In response to a hypothetical question from the ALJ, Vocational Expert Donna Nealon testified that a person limited to, *inter*

*alia*, occasional handling with his left upper extremity would nonetheless be able to work as a laundry laborer, hospital cleaner, and counter-supply worker, as those occupations are defined in the DOT. Claimant argues that VE Nealon's testimony conflicts with the DOT because each of these three representative occupations require frequent handling. The parties agree that when a VE's testimony conflicts with the DOT, the ALJ is required to "elicit a reasonable explanation for and resolve" the conflict. *Pearson v. Colvin*, 810 F.3d 204, 208 (4th Cir. 2015); SSR 00-4p, 2000 WL 1898704 (Dec. 4, 2000). The parties disagree as to whether the ALJ complied with this requirement when she relied on the VE's testimony in this matter. (ECF No. 9 at 4; ECF No. 10 at 8).

The Commissioner points out that the ALJ found the Claimant was able to frequently handle with his right hand, and only found a limitation to occasional handling with the left upper extremity. (ECF No. 10 at 9). As acknowledged by the VE, the DOT merely states that the representative occupations require frequent handling, and it does not address "right versus left"—*i.e.*, handling with individual arms. VE Nealon testified that "in those circumstances [her] testimony is based on [her] experience working with employers in the field." (Tr. 50-51).

Claimant argues, in turn, that it was insufficient for the VE—and by extension, the ALJ in relying on the VE's testimony—to merely point to the VE's own "experience" to resolve the ambiguity in the DOT. (ECF No. 9 at 6-7; ECF No. 11 at 2-3). Rather, a "reasonable explanation" required the VE to explain whether the representative occupations require bilateral handling with the upper extremities, or whether they only require frequent handling with one upper extremity. (ECF No. 11 at 3). Claimant argues that "a VE's vague and unexplained reference to [his or her] experience, without more, is not a sufficient explanation [as] . . . it would involve this Court in guesswork." *Id.*

In *Pearson*, relied upon by both parties in this matter, the Fourth Circuit explained that the DOT is silent on different types of reaching or handling—*e.g.*, overhead versus forward handling—and about the use of one arm versus both arms. *Pearson*, 810 F.3d at 209-11. The DOT ambiguously characterizes handling as, for example, "frequent" or "occasional" without describing whether that "frequent" or "occasional" handling must occur in one direction or all directions, or with one arm or both arms. *Id.* Because the broad definition in the DOT covers a wide range of potential abilities, the Fourth Circuit determined that "it is the purview of the ALJ to elicit an explanation from the expert" as to whether the representative occupations require bilateral reaching. *Id.* The Fourth Circuit qualified that "[d]eciding that the vocational expert's testimony apparently conflicts with the [DOT] here does not mean that an ALJ must find [a] claimant with this limitation, unable to perform these jobs." *Id.* "Rather, it simply means that the ALJ and the expert should address exactly what form of reaching the stated occupations require and whether the claimant can fulfill those requirements." *Id.*

This issue was addressed squarely by the U.S. District Court for the Middle District of North Carolina in *Crouse v. Saul*, 1:18-cv-269, 2019 WL 4015553 (M.D.N.C. Aug. 26, 2019), *adopted*, 2019 WL 5783532 (M.D.N.C. Sept. 16, 2019). In *Crouse*, the ALJ assessed the claimant's RFC and found he could occasionally reach in all directions with his dominant, right-upper extremity. *Id.* at *3. Just as in the instant matter, the VE in *Crouse* testified that the claimant was capable of performing three representative occupations—all requiring frequent reaching pursuant to the DOT. *Id.* The VE in *Crouse* testified that the DOT does not set forth "the breakdown of reaching right versus left," and as such she referred to her training, education, and experience in support of her testimony that the claimant could perform the representative occupations provided. *Id.* at *4. On review, the

U.S. District Court for the Middle District of North Carolina found that the VE's testimony was inadequate for the ALJ to rely upon, without more, in finding that the *Crouse* claimant could perform the representative occupations. *Id.* at *4-5. While the VE acknowledged that the DOT did not set forth "the breakdown of reaching right versus left" the *Crouse* court found that such "effort on the part of the VE to identify some <u>general</u> conflict between her testimony and the DOT regarding reaching . . . is simply too vague and ambiguous to fairly constitute an identification of the <u>specific</u> apparent conflict raised by Plaintiff here." *Id.* at *5.

The *Crouse* court further found that the VE's testimony that her conclusions were "consistent with [her] 25 plus years of . . . talking with employers, doing jobs, being in the industry" was patently inadequate to constitute a "reasonable" explanation in compliance with the Fourth Circuit's *Pearson* decision. *Id.* (citing *Pearson*, 810 F.3d at 211). The VE's bald reference to her experience was inadequate under the circumstances because "there [was] no 'breakdown' regarding 'reaching right versus left' in the VE's testimony or in the ALJ's decision." *Id.* The *Crouse* court explained that, "[w]hile a VE may resort to personal experience to explain why her opinion remains reliable despite an apparent conflict with the DOT, . . . that explanation must itself be stated clearly enough to be susceptible to judicial review." *Id.*

The *Crouse* court differentiated the error before it from a similar matter, *Allen v. Berryhill*, 1:17-cv-277, 2018 WL 2025666 (M.D.N.C. May 1, 2018). In *Allen*, the VE "expressly acknowledged that the DOT neither differentiated between unilateral and bilateral reaching, nor specifically addressed the direction of reaching involved"— however, he then properly "relied on his own professional experience to opine that an individual who could not reach overhead with the left, non-dominant arm could still

perform all three of the jobs in question." *Crouse*, 2019 WL 4015553, at *5 (citing *Allen*, 2018 WL 2025666, at *6. In other words, rather than vaguely referring to his experience, without more, like the VE in *Crouse*, the VE in *Allen* relied on his experience and then went on to specifically "opine that an individual who could not reach overhead with the left, non-dominant arm could still perform all three of the jobs in question." *Allen*, 2018 WL 2025666, at *6.

Here, just as in *Crouse*, the ALJ and the VE each failed to address what form of handling the three representative occupations require in the context of a single-hand limitation, and whether Claimant can fulfill those requirements in light of his limitation to occasional handling with his left hand. Precisely like the VE in *Crouse*, and unlike the VE in *Allen*, here VE Nealon's testimony that the DOT does not differentiate between "right versus left" is inadequate because it does not resolve the ambiguity left by the DOT—the "breakdown" regarding "right versus left" in the VE's testimony or in the ALJ's decision.

While VE Nealon testified that "in those circumstances [her] testimony is based on [her] experience working with employers in the field" (*see* Tr. 50-51), the VE's vague reference to her experience does not satisfactorily address whether the VE actually found that the identified jobs do not require frequent handling bilaterally. Just as in *Crouse*, the VE's explanation why her opinion remains reliable despite an apparent conflict with the DOT was not stated clearly enough to be susceptible to judicial review. Nor did the ALJ provide any analysis to help explain how the VE's testimony was interpreted and relied upon. Thus, just as in *Crouse*, the ALJ in the instant matter provided insufficient analysis and explanation to reasonably allow for judicial review, either in the VE's identification

of the apparent conflict, in the VE's explanation for why that apparent conflict could be disregarded, or in the ALJ's own analysis set out in the decision.

Moreover, it is clear from the record that the ALJ's failure to provide a reasonable explanation for the conflict is not harmless under the circumstances. As the Commissioner points out, in response to questioning from Claimant's counsel, VE Nealon testified that there would be <u>no work</u> for the ALJ's hypothetical individual should he be limited to "occasionally . . . handling . . . bilaterally." (Tr. 50). Accordingly, remand is in order.

### B.    Claimant's Second Assertion of Error

Claimant's second assertion of error concerns the ALJ's step-three determination that Claimant's impairments did not meet or equal the criteria of an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. *See* 20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii). In her written decision, the ALJ found that Claimant's mental impairments did not satisfy the "paragraph C" criteria for a Neurocognitive Disorder under Listing 12.02 of the applicable regulations. *See* 20 C.F.R. Pt. 404, Subpt. P., App'x 1, § 12.00(A)(2).[6] Claimant argues that remand is proper because the ALJ's written decision did not adequately explain why Claimant's mental impairments did not meet these criteria. (ECF No. 9 at 8). Claimant points out that the ALJ's sole express reference to the paragraph C criteria in her written decision is a mere conclusory statement that "[t]here is no documentation in this record to indicate the claimant meets such further

---

[6] To satisfy the criteria for Listing 12.02(c), the Claimant must demonstrate, in relevant part, that he (i) relies, on an ongoing basis, upon medical treatment, mental health therapy, psychosocial support(s), or highly structured setting(s) to diminish the symptoms and signs of his mental disorder; and (ii) despite improved signs and symptoms, has only achieved "marginal adjustment," defined as minimal ability to adapt to changes that are not already part of his life, and/or changes or increased demands lead to exacerbation of symptoms or signs. *Id.* at § 12.00(G)(2)(c). (*See* ECF Nos. 9 at 8-9; 10 at 13-14).

requirements (Exhibit 10F).” (Tr. 24). The ALJ’s citation to “Exhibit 10F” in the record refers to the Psychological Evaluation report prepared by Psychologist Kelly Robinson, M.A. (Tr. 587-92). However, Ms. Robinson’s report does not directly address the “paragraph C” criteria or Listing 12.02.

The Commissioner argues that it is clear the ALJ’s conclusion is supported by substantial evidence when the ALJ’s written decision is read “as a whole” rather than “in a vacuum.” (ECF No. 10 at 14). In support of his position, the Commissioner notes that “[e]arlier in the [ALJ’s] decision” she notes Ms. Robinson’s findings from the consultative examination that Claimant “maintained good eye contact and his speech production was good; he was cooperative and stated he had regular contact with his friends and his children[.]” (ECF No. 10 at 14; Tr. 23, 587-88). The Commissioner also notes that the ALJ cited to other evidence “elsewhere in the record.” (ECF No. 10 at 15).

Glaringly absent, however, from the ALJ’s decision is any explanation logically tying the ALJ’s recitation of this evidence to the ALJ’s conclusion. Nor is the connection between evidence and conclusion obvious, even when reading the decision as a whole. It is well-established that an ALJ’s written decision must “build an accurate and logical bridge” between the evidence and the ALJ’s conclusion. *Arakas v. Comm’r, Soc. Sec. Admin.*, 983 F.3d 83, 100 (4th Cir. 2020). When an ALJ fails to provide a narrative discussion of how the evidence supports her conclusion, “the analysis is incomplete and precludes meaningful review.” *Id.* at 106. The ALJ’s cursory recitation of the evidence fails to build an accurate and logical bridge between Ms. Robinson’s report and the ALJ’s determination that the paragraph C criteria are not met. (*See* Tr. 24). For example, it is unclear how Ms. Robinson’s observation of “good eye contact” and good speech production during a consultative examination translates to the ALJ’s conclusion that

there is no evidence of "marginal adjustment" under § 12.00(G)(2)(c). (Tr. 23, 587-88). In other words, the ALJ merely recites Ms. Robinson's observations without explaining how this evidence applies to the listing criteria. This incomplete analysis precludes meaningful review, as the Court is unable to follow the ALJ's reasoning.

While the Commissioner points out that elsewhere in the decision, the ALJ pointed to evidence that Claimant's behavior was normal and that Claimant was capable of performing his activities of daily living, the record is also replete with conflicting evidence that could support a different conclusion. Within Ms. Robinson's own report, she also gave a "rule out diagnosis of Unspecified Mild Neurocognitive Disorder" and found that Claimant had "fair" insight; impaired recent memory; deficits on three subtests of the Cognistat testing; "fair" grooming and personal hygiene; performed with a "slow" pace and required repeated encouragement on portions of the testing; and "appear[ed] incapable to manage any benefits he might receive." (Tr. 592). In light of such evidence, the ALJ's threadbare conclusion—asserting "[t]here is no documentation in this record to indicate the claimant meets . . . [the "paragraph C"] requirements" (Tr. 24)—requires explanation, and cannot be gleaned simply by reading the decision as a whole.

Certainly, it is the ALJ's task—not the task of this Court—to resolve conflicts in the evidence. However, the ALJ must explain how she reached resolution of such conflicts in a manner sufficient for the Court to conduct a meaningful review. Simply put, the ALJ failed to do so in this case—particularly in light of the considerable conflicting evidence outlined in Claimant's brief (ECF No. 9 at 10-13). *See Radford v. Colvin*, 734 F.3d 288, 295 (4th Cir. 2013).

As the U.S. District Court for the District of Maryland explained under similar circumstances, "[t]o be sure, the ALJ may ultimately determine that the factual findings

identified above do not satisfy [the applicable] criteria." *Robin C. v. O'Malley*, 23-cv-1432, 2024 WL 2784178, at *4 (D. Md. May 30, 2024). "But the ALJ—not the Court—must make this determination in the first instance." *Id.* On finding that the ALJ in *Robin C.* "provided no explicit analysis on the issue," the U.S. District Court for the District of Maryland explained that it "[would] not attempt to [guess] the ALJ's reasons for finding that Plaintiff could not satisfy Paragraph C's final criterion[.]" *Id.*

Just as in *Robin C.*, in the instant matter the ALJ's lack of explanation precludes the Court from determining whether substantial evidence supported the ALJ's step-three determination. As a result, remand is required to allow the ALJ to specifically apply the "paragraph C" criteria of Listing 12.02 to the evidence of record, *and* explain why that evidence does or does not support a finding that Listing 12.02 is met or equaled. *Robin C.*, 2024 WL 2784178, at *4.

## IV.    RECOMMENDATION

For the foregoing reasons, the undersigned respectfully **RECOMMENDS** that the presiding District Judge **GRANT** Claimant's request for remand (ECF No. 9), **DENY** the Commissioner's request to affirm the final decision (ECF No. 10), **REVERSE** the final decision of the Commissioner; and **REMAND** this matter back to the Commissioner for further administrative proceedings pursuant to the fourth sentence of 42 U.S.C. § 405(g).

The parties are notified that this Proposed Findings and Recommendation is hereby **FILED** and a copy will be submitted to the Honorable Joseph R. Goodwin, United States District Judge. Pursuant to the provisions of 28 U.S.C. § 636(b)(1)(B) and Federal Rule of Civil Procedure 72(b), the parties shall have fourteen (14) days from the date of the filing of this Proposed Findings and Recommendation to file with the Clerk of this Court specific written objections identifying the portions of the Proposed Findings and

Recommendation to which objection is made and the basis of such objection. Extension of this time period may be granted for good cause shown. Copies of any objections shall be served on opposing parties and provided to Judge Goodwin.

Failure to file written objections as set forth above shall constitute a waiver of *de novo* review by the District Court and a waiver of appellate review by the Fourth Circuit Court of Appeals. 28 U.S.C. § 636(b)(1); *see Thomas v. Arn*, 474 U.S. 140, 155 (1985); *Snyder v. Ridenour*, 889 F.2d 1363, 1366 (4th Cir. 1989); *Wright v. Collins*, 766 F.2d 841, 846 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91, 94 (4th Cir. 1984).

The Clerk is **DIRECTED** to file this Proposed Findings and Recommendation and to transmit a copy of the same to counsel of record.

ENTERED:   January 12, 2026

Dwane L. Tinsley
United States Magistrate Judge